## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| JARYAN GILLS, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-4011 |
| | ) | |
| ROBERT HAMILTON *et al.*, | ) | |
|     Defendants. | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court is a Motion for Summary Judgment (Doc. 84) filed by Defendants Scott Burzlaff, Nathan Cox, Theresa Dunn, Robert Hamilton, Terry Jensen, Nathaniel McBride, Rebecca Rodman, Isaac Stone, Mark Tapia, John Trujillo, John Varga, and Anastasia Wierema. Plaintiff Jaryan Gills has filed a Cross-Motion for Partial Summary Judgment against Burzlaff, Cox, Dunn, Hamilton, Rodman, Jensen, Tapia, Trujillo, Varga, and Wierema (Doc. 82).

### I.    Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of providing proper documentary evidence to show

the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015).

"When opposing a properly supported motion for summary judgment, the non-moving party must 'cit[e] to particular parts of materials in the record' or 'show[] that the materials cited do not establish the absence … of a genuine dispute.'" *Melton v. Tippeconoe County*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A scintilla of evidence supporting the nonmovant's position is insufficient to defeat a motion for summary judgment; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252.

"Cross-motions for summary judgment are considered separately, and each party requesting summary judgment must satisfy the Rule 56 standard before judgment will be granted in its favor." *Mishaga v. Schmitz*, 136 F. Supp. 3d 981, 983 (C.D. Ill. 2015).

## II.    Background

In July 2022, Plaintiff filed a six-count Second Amended Complaint (Doc. 58), alleging federal and state law violations during his incarceration at East Moline Correctional Center ("EMCC"). Specifically, Plaintiff alleged that Defendants were

deliberately indifferent to his serious medical needs (count II), subjected him to inhumane conditions of confinement (count III), and participated in a civil conspiracy to deprive him of his constitutional rights (count IV). Plaintiff further alleges state law claims for Intentional Infliction of Emotional Distress ("IIED") (count V) and conspiracy to inflict IIED (count VI).

## III.   Defendants' Motion for Summary Judgment

### A. Material Facts

On February 8, 2020, at about 2:45 p.m., Plaintiff suffered injuries after an inmate struck him. (Pl. Amend. Compl., Doc. 58 at 8:45.) On February 10, 2020, Dr. Munns, an orthopedic surgeon, performed surgery to repair a radial head fracture and resulting instability of Plaintiff's left elbow. (Pl. Med. Rec., Doc. 88-2 at 18.) Specifically, Dr. Munns conducted a left radial head implant arthroplasty and lateral ulnar collateral ligament repair. (*Id*.) On February 14, 2020, Dr. Munns performed a second surgery to correct "notable instability of the [left] elbow" by realigning Plaintiff's arm at a specific angle and inserting rods to hold the elbow in that position. (*Id*. at 20.)

EMCC has two medical segregation cells in the Healthcare Unit ("HCU") designated for inmates assigned to restrictive housing who must remain in the HCU for medical reasons. (Def. Disc. Resp., Doc. 85-12 at 2.) The medical segregation cells do not have a sink or toilet. (*Id*. at 3.) Plaintiff was housed in medical segregation cell 3005 from February 8 to March 9, 2020. (Pl. Dep., Doc. 85-1 at 146:16-18.) Plaintiff was given a cup for water when permitted to go to the bathroom and was provided a portable urinal. (Pl. Dep., Doc. 85-1 at 55:8-10, 16-19.) About six to ten days after entering cell 3005, Plaintiff

was given his personal property, including a toothbrush. (*Id*. 57:19-23, 58:13-24.) Plaintiff

was also given a mattress, a sheet, and a blanket. (*Id*. at 58:7-12.) On June 1, 2020, Plaintiff

was released from the infirmary but continued to be housed in the HCU until July 2, 2020.

(*Id*. at 157:13-25; 168:9-14.)

On February 9, 2020, Defendants Stone and McBride interviewed Plaintiff

regarding the February 8, 2020 incident. (Def. Ans., Doc. 61 at 26:148.) On February 17,

2020, McBride issued Plaintiff an Offender Disciplinary Report ("ODR") for violating

Rule 214, which prohibits fighting. (Pl. MSJ, Doc. 85-3 at 18.) Specifically, McBride

documented the following:

> The following … is being issued to [Plaintiff] based on an
> Intelligence Unit Investigation that ended on [February 17,
> 2020]. On [February 8, 2020,] in [Housing Unit 4,] inmate
> Heath and [Plaintiff] got into a verbal argument over phone
> usage. … [Plaintiff] admitted to grabbing and wrestling with
> Heath after Heath struck [Plaintiff] three times in the face
> with a closed fist. Both … then fell to the ground[,] and the
> altercation ended. As a result of the fight[, Plaintiff] received
> [nine] stitches around his right eye and a broken left arm.
> Heath had no visible injuries. [A] Confidential Source (CS)
> corroborated [Plaintiff's] statement stating Heath struck
> [Plaintiff] three times in the face. The CS deemed credible by
> giving an independent corroborating statement in a separate
> interview."

(*Id*.)

On March 7, 2020, Defendant McBride issued Plaintiff an Offender Investigative

Report, and Plaintiff was transferred to temporary confinement under investigative

status. (*Id*. at 17.) On February 18, 2020, Defendants Trujillo and Wierema, acting as an

Adjustment Committee, conducted a hearing on the alleged rule violation. (Adj. Cmte.

Rpt., Doc. 58-9 at 2.) Plaintiff pleaded not guilty and stated that he "never got a chance to swing. I grabbed [Heath] from (*sic*) not hitting me again with a lock." (*Id*.)

The Committee found that Plaintiff had violated the rule prohibiting fighting based on Plaintiff's "partial admission" and the February 17, 2020, investigative report Defendant McBride authored, which the Committee quoted. The Committee recommended the following disciplinary action: C Grade status for a month, a month of segregation, $4,509.28 restitution to EMCC, and a transfer from EMCC. (*Id*.) On February 25, 2020, Defendant Hamilton approved the Committee's recommendation. (*Id*. at 3.) Plaintiff testified that Defendant Wierema later gave him documentation that the rule violation was expunged from his record. (Pl. Dep., Doc. 85-1 at 73:10-11.)

Defendant Hamilton, as Warden of EMCC, supervised the Assistant Warden of Operations and Assistant Warden of Programs, among others. (Hamilton Disc. Resp., Doc. 85-13 at 6, 9.) Hamilton stated that he would manage only a portion of the correspondences mailed to him and that his support staff processed letters or request slips. (*Id*.) In this regard, the staff would contact the appropriate department or program and draft a letter to the inmate, which Hamilton would review and sign. (*Id*.) Hamilton noted that request slips are processed similarly, but the answer is written on the slip. (*Id*.) When the Warden's office received a grievance from the Grievance Officer, the provided recommendation would be reviewed by one of the three Wardens and sent to the inmate who submitted the grievance. (*Id*. at 9-10.)

Plaintiff testified that he filed suit against Defendant Hamilton because, as Warden, he was "in control" of EMCC, and everything that occurred at the facility was

"under his watch." (Pl. Dep., Doc. 85-1 at 13:7-15.) Plaintiff wrote three letters with attached request slips to Hamilton. (*Id*. at 37:13-16.) Plaintiff sent his first letter between February 14 and 16, 2020. (*Id*. at 38:12-18.) Plaintiff could not recall the precise content but stated it pertained to his confinement in a cell with no toilet or sink, that he was forced to defecate in trays and urinate in the corners of his cell, and that the staff was not allowing him to use the restroom or checking on his medical status. (*Id*. at 3821-25; 39:1-6.)

Plaintiff's second letter, which he acknowledged raised the same issues as his first one, was sent on February 17, 2020. (*Id*. at 39:12-18.) The next day, Plaintiff sent his third letter, which, although similar to his first letter, included content regarding the disciplinary report issued to Plaintiff. (*Id*. at 40:3-9.) Plaintiff did not receive responses to his three letters. (*Id*. at 39:9-11; 40:10-12; 41:7-9.) After being released from medical segregation, Plaintiff spoke with Defendant Hamilton between March 11 and 15, 2020. (*Id*. at 42:24-25; 43:1-19.) During their conversation, Hamilton told Plaintiff he did not receive Plaintiff's letters or grievances and told Plaintiff that the signature on the grievance shown to him was not his signature. (*Id*. at 43:20-25; 44:1-5.)

Defendant Varga served as the Assistant Warden of Operations at EMCC. (Varga Disc. Resp. Doc. 85-12 at 1.) Plaintiff named Varga in his lawsuit because he put Varga "on notice" about "what was going on," and Varga responded, "[U]ntil we find out what we are going to do with you, you have to sit up there." (*Id*. at 23:6-15.) Plaintiff acknowledged that he only spoke to Varga once and did not write him any request slips. (*Id*. at 1- 6.)

In February 2020, Defendant McBride was employed as an Intelligence Officer at EMCC. (McBride Dep., Doc. 85-2 at 11:4-19.) In that capacity, McBride was responsible for gathering information, investigating incidents, and writing Internal Disciplinary Reports, commonly called disciplinary tickets. (*Id*. at 22:1-9; 24:3-20.) McBride confirmed he did not participate in the Adjustment Committee hearing for Plaintiff's discipline related to the February 8, 2020 incident, nor did he make any recommendations for disciplinary action. (*Id*. at 34:1-21.)

Defendant McBride explained that when inmates engage in a physical altercation, they are immediately separated. (*Id*. at 49:22-24; 23:1-2.) The inmates are kept in temporary confinement or segregation during the ensuing investigation. (*Id*. at 50:18-21.) McBride interviewed Plaintiff on February 9, 2020, in cell 3005 and asked Plaintiff to provide his account of what occurred, and Plaintiff complied. (*Id*. at 46:22-24; 23:1-2.) Two days later, McBride and Defendant Stone returned to Plaintiff's cell, but Plaintiff did not speak to McBride then. (*Id*. at 46:18-24; 47:11-14, 18-20.) Plaintiff did not speak with McBride after February 9, 2020. (*Id*. at 47:11-14.) In March 2020, McBride was promoted to Lieutenant and transferred from EMCC. (*Id*. at 11:8-9.)

In February 2020, Defendant Stone was employed as a corrections officer assigned to Internal Affairs. (Stone Dep., Doc. 85-8 at 11:14-17.) Stone's duties included investigating unusual incidents at EMCC, such as fighting. (*Id*. at 11:18-23.) Stone has never served on the Adjustment Committee. (*Id*. at 51:16-18.) Stone does not recall whether Plaintiff sent a letter to the Internal Affairs office. (*Id*. at 48:6-9.) However, Stone

added that if Internal Affairs had received a letter from Plaintiff related to the investigation, the letter would have been placed in the investigatory file. (*Id*. at 48:10-14.)

On February 9, 2020, Defendants McBride and Stone took pictures of Plaintiff's arm and face during his stay in cell 3005, which Plaintiff confirmed. (Pl. Dep., Doc. 85-1 at 26:18-24; 93:10-11.) Plaintiff also confirmed that on February 14, 2020, Stone delivered blank grievance forms Plaintiff requested. (*Id*. at 27:3-17.) Besides Stone taking pictures and delivering grievance forms, Plaintiff had no other contact with Stone. (*Id*. at 28:3-5.)

Defendant Tapia, a Corrections Sergeant, confirmed that before his retirement in September 2020, EMCC had two medical segregation cells in the HCU with a bed, a window with bars, a chuck hole, and a couple of portable urinals but no toilet. (Tapia Dep., Doc. 85-4 at 9:21-21; 10:8-10; 26:19-23; 29:1-24; 30:1-8.) Tapia noted that if an inmate in a medical segregation cell had to defecate, he would need to be escorted to a bathroom. (*Id*. at 26:14-18.)

In February 2020, Defendant Cox worked at EMCC as a Corrections Sergeant. (Cox Dep., Doc. 85-5 at 13:5-7.) On February 8, 2020, Cox worked the 7 a.m. to 3 p.m. shift in Housing Units one and two. (*Id*. at 30:5-24; 31:12-24; 32:1-21.) On February 22, 2020, Cox was assigned to work in the HCU on the 3 to 11 p.m. shift. (*Id*. at 40:2-9.) When assigned to work in the HCU, part of the duties included monitoring medical segregation. (*Id*. at 41:2-5.) Plaintiff alleges that on February 22, 2020, Cox initially refused Plaintiff's request to use the restroom, then locked Plaintiff in the restroom for over an hour. (Pl. Dep. Doc. 85-1 at 16:9-12.)

Defendant Jensen was employed as a Correctional Lieutenant at EMCC. (Def. Disc. Ans., Doc. 61 at 4:17.) Jensen noted that EMCC policy is to transport inmates housed in the HCU's medical segregation cells to the Restrictive Housing Unit instead of using the showers in the HCU. (Jensen Dep., Doc. 85-7 at 33:2-10.) Jensen explained that the HCU showers are not used for security reasons because EMCC officials cannot observe inmates in the HCU shower as they lack viewing ports. (*Id*. at 33:13-16.)

Instead, inmates who are housed in medical segregation are transported by van to the Restrictive Housing Unit showers, which are about three city blocks away. (*Id*. at 33:19-22.) Plaintiff acknowledges that Defendant Jensen escorted him to the shower on at least two occasions. (Pl. Dep. Doc. 85-1 at 88:17-25; 89:1-8.) Jensen stated he was unaware that Plaintiff ever defecated on a food tray, adding that such an act "would be considered a major infraction" and "would always generate a ticket and … an incident report." (Jensen Dep., Doc. 85-7 at 58:11-22.)

Defendant Rodman was a corrections officer at EMCC from January 2018 to October 2021. (Rodman Dep., Doc. 85-9 at 10:4-20.) Rodman noted that when inmates are housed in medical segregation, they are assigned three shower days per week. (*Id*. at 37:13-23.) Rodman would have to deny Plaintiff's request for a shower because she is a female. (*Id*. at 61:19-22.) Rodman has not seen an inmate defecate in a medical segregation cell, and if it had occurred, the inmate would have been issued an incident report. (*Id*. at 40:1-3, 13-14.)

Defendant Wierema served as an Adjustment Committee member who presided over the February 18, 2020, hearing on Plaintiff's Offender Disciplinary Report that

alleged he violated the rule against fighting. (Wierema Disc. Resp., Doc. 85-14 at 1.)
Plaintiff stated that Wierema was never assigned to the HCU and confirmed that he
named Wierema in his lawsuit because of her role on the Adjustment Committee. (Pl.
Dep., Doc. 85-1 at 19:1-11.) Plaintiff had no interactions with Wierema before February
18, 2020. (*Id*. at 63:20-25; 64:1-4.) Wierema did not know about any inmate defecating in
the HCU's medical segregation cells. (Wierema Disc. Resp., Doc. 85-14 at 3.)

Defendant Trujillo, a corrections officer, served alongside Defendant Wierema as
an Adjustment Committee member who presided over the February 18, 2020, hearing on
Plaintiff's Offender Disciplinary Report that alleged he violated the rule against fighting.
(Trujillo Disc. Resp., Doc. 85-15 at 1.) Plaintiff had no interactions with Trujillo before
February 18, 2020. (Pl. Dep., Doc. 85-1 at 28:1-11.) Trujillo did not know about any inmate
defecating in the HCU's medical segregation cells. (Trujillo Disc. Resp., Doc. 85-14 at 3.)
Plaintiff named Trujillo in his lawsuit because of his role on the Adjustment Committee.
(Pl. Dep., Doc. 85-1 at 28:25; 29:1-5.)

Defendant Dunn worked at EMCC as a Correctional Nurse II. (Dunn Dep., Doc.
85-10 at 11:19-21.) Defendant Dunn testified that as a nurse, she was not allowed to
determine by herself what medications an inmate in HCU should receive. (*Id*. at 31:6-8.)
If an inmate asks for medication that is not prescribed, Dunn could not administer it to
the inmate. (*Id*. at 31:12-15.) Instead, a physician determines what medications inmates in
the HCU receive. (*Id*. at 30:23-24; 31:1.)

Medical staff conduct two to three rounds per shift through the HCU. (*Id*. at p.
42:10-13.) If Dunn noticed a medication running low in stock, she would ask the

pharmacy tech to order more. (*Id.* at p. 45:15-18.) In some instances, Dunn could not provide medication to inmates due to shortages or unavailability. (*Id.* at p. 45:19-23.) If an inmate had been prescribed medication that was out of stock, Dunn would have recorded it in the inmate's medical record. (*Id.* at p. 94:1-5.) If inmates require physical therapy, they are sent to an outside facility, as EMCC does not have that specialty on staff. (*Id.* at p. 94:5-22.)

On or about February 9, 2020, at 2:00 a.m., Defendant Dunn saw Plaintiff with a correctional officer present. (*Id.* at p. 76:8-11; Pl. Med. Rec., Doc. 85-11 at 43.) Dunn noted that she provided Plaintiff four hundred milligrams of ibuprofen and instructed him to notify nursing of any changes or concerns. (Dunn Dep,. Doc. 85-10 at 78:24; 79:1-11; Pl. Med. Rec., Doc. 85-11 at 43.)

On February 11, 2020, Defendant Dunn saw Plaintiff at 5:35 a.m. and documented that Plaintiff was yelling, cursing, acting belligerent, uncooperative, and threatened to write a grievance against her. Dunn provided Plaintiff prescription-strength Tylenol tabs and twenty milligrams of Pepcid. Dunn also advised Plaintiff of the possibility that the medication was upsetting his stomach due to his recent surgery and told him to sip water and not chug it until the anesthesia wore off. Dunn noted that Plaintiff refused to acknowledge her instructions. (Pl. Med. Rec., Doc 85-11 at 46.) Dunn saw Plaintiff again on February 17, 2020, at 11:50 p.m. and issued him prescription strength Tylenol tabs, encouraging him to keep his arm elevated as much as possible. (*Id.* at 48.)

Defendant Dunn stated she was not involved in assigning Plaintiff's cell, and if an inmate had urinated or defecated in a medical segregation cell, she would have been able

to see it through the door and would have noted it in the inmate's medical record. (Dunn

Dep. ,Doc. 85-10 at 83:11-16; 99:6-8; 102: 101:22-24; 102:19-24; 103:1-11.)

### B. Analysis

#### 1. Deliberate Indifference

"Because the Eighth Amendment requires that inmates receive adequate medical

care, officials violate the Constitution when they are deliberately indifferent to inmates'

serious medical needs." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 747 (7th Cir. 2017). "A

claim of deficient medical care requires proof of an objectively serious medical condition,

and the official's deliberate indifference to that condition." *Id*.; *see also Lewis v. McLean*,

864 F.3d 556, 562 (7th Cir. 2017) ("The Eighth Amendment's proscription against

'unnecessary and wanton infliction of pain' is violated when prison officials demonstrate

'deliberate indifference to serious medical needs' of prisoners—whether the indifference

'is manifested by prison doctors in response to prison needs or by prison guards in

intentionally denying or delaying access to medical care.'") (quoting *Estelle v. Gamble*, 429

U.S. 97, 104 (1976)).

"[A] claim based on deficient medical care must demonstrate two elements: 1) an

objectively serious medical condition; and 2) an official's deliberate indifference to that

condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). "'Deliberate indifference'

demands more than a showing of mere negligence: 'an official's failure to alleviate a

significant risk that [s]he should have perceived but did not, while no cause for

commendation, cannot . . . be condemned as the infliction of punishment.'" *Conley v.*

*Birch*, 796 F.3d 742, 746-47 (7th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)).

On October 18, 2023, Plaintiff filed his response (Doc. 88) to Defendants' Motion for Summary Judgment. Therein, Plaintiff appended his Supplemental Declaration (Doc. 88-2 at 40-50:1-63), where counsel represents that Plaintiff reviewed and signed a signature page that Plaintiff's counsel intended to file with the Court when received. To date, no signature page has been filed with this Court.

Furthermore, the Court's review of Plaintiff's unverified Supplemental Declaration, which spans eleven pages, is merely slightly modified excerpts of the allegation in his Second Amended Complaint (Doc. 58). For example, paragraph 113 of Plaintiff's Second Amended Complaint states as follows:

> On February 24, 2020, Tapie again denied Mr. Gills's requests to use the restroom his entire eight-hour shift from approximately 7:00 AM to 3:00 PM. Mr. Gills was again forced to defecate in a lunch tray and urinate in the corner of the Cell.

(Doc. 58 at 23:113.)

Paragraph 59 of Plaintiff's Supplemental Declaration states, as follows:

> On February 24, 2020, Tapia again denied my request to use the restroom his entire eight-hour shift from approximately 7:00 AM to 3:00 PM. I was again forced to defecate in a lunch tray and urinate in the corner of the Cell.

(Doc. 88-2 at 50:59.)

The Court notes that Plaintiff cites his Supplemental Declaration as supporting most of his additional material facts (Doc. 88 at 14-30:1-89) in his response to Defendants' dispositive motion.

However, the Seventh Circuit has expressly prohibited represented parties from resisting summary judgment by merely reciting the content of their Complaints via affidavit. In *James v. Hale*, 959 F.3d 307 (7th Cir. 2020), citing its decision in *Ford v. Wilson*, 90 F.3d 245 (7th Cir. 1996), cautioned, as follows:

> Before turning to the sham-affidavit rule, we pause to address the district court's application of our decision in *Ford v. Wilson*. The judge assumed that *Ford* generally authorizes a plaintiff to convert allegations in a complaint into an affidavit that is capable of defeating summary judgment. In other words, if James's affidavit hadn't turned out to be a sham, the district judge would not have adopted the magistrate judge's recommendation to disregard it. Still, the judge disapproved of James's use of this "conversion" technique, particularly since he was represented by counsel. He suggested that the tactic "makes a mockery of how summary judgment is supposed to work."

> The judge's point is well-taken, so we take this opportunity to clarify *Ford*'s scope. Roy Ford filed a verified pro se civil-rights complaint against a police officer who arrested him after a traffic stop. The officer moved for summary judgment, and the judge granted the motion because Ford had not submitted an affidavit or other evidence in opposition. *Ford*, 90 F.3d at 246–47. Although we ultimately affirmed the judgment, we reasoned that because Ford had verified his complaint, some of its contents "were affidavit material." *Id.* at 247.

> We began our analysis with the general principle that a plaintiff may not rely on mere allegations or denials in his complaint when opposing a properly supported motion for summary judgment. *Id.* at 246–47. We explained, however, that a verified complaint—signed, sworn, and submitted under penalty of perjury—can be considered "affidavit material" provided the factual allegations otherwise satisfy the affidavit criteria specified in Rule 56 of the Federal Rules of Civil Procedure and the declarant complies with 28 U.S.C. § 1746, which sets forth the requirements for verification under penalty of perjury. *Id.* at 247.

We took pains, however, to sound a cautionary note. Because this tactic undermines the function of Rule 56, we pointedly said that "[w]e do not mean to commend the practice." *Id.* We explained that Rule 56 requires "the submission of evidentiary material in response to a motion for summary judgment as a means of sharpening the issues, so that the judge can determine just what if anything must be tried." *Id.* Merely pointing to assertions in a verified complaint "is bound to make the identification of genuine issues of material fact difficult, complicating the work of the judge." *Id.* Still, we did not think that this "departure from proper practice" was "so egregious or such a burden on the court as to warrant the fell sanction of dismissal" in Ford's case, especially since he was litigating pro se and had not been warned against this approach.

Importantly, every out-of-circuit case we relied on for support in *Ford* dealt with a litigant who was not represented by counsel when he verified his complaint. *See Colon v. Coughlin*, 58 F.3d 865, 868 (2d Cir. 1995); *Schroeder v. McDonald*, 55 F.3d 454, 456 (9th Cir. 1995); *King v. Dogan*, 31 F.3d 344, 345 (5th Cir. 1994). Not once in the 24 years since *Ford* was decided have we allowed a represented party to resist summary judgment by submitting an affidavit swearing to the allegations in the complaint after significant discovery. We see no reason to make this case the first. *Ford* struck a delicate balance between issue clarification and equity. James asks us to upset this balance, insisting that we accept an affidavit that reaches back past extensive discovery conducted with the assistance of counsel to repeat assertions in a pro se complaint. That approach obscures rather than clarifies the determination of material factual issues. In addition, the equities are quite different when a party is represented by counsel.

In sum, *Ford* should not be understood as a general authorization for a represented plaintiff to defeat summary judgment after extensive discovery by the simple expedient of swearing in an affidavit that the allegations in the complaint are true. There is no authority in this circuit for such "reach back" complaint verification.

*Id.* at 314-15.

The Court's review of Plaintiff's Supplemental Declaration reveals that the "facts" Plaintiff provided are primarily confined to his deliberate indifference and conditions of confinement claims against Defendants. Mindful of the Seventh Circuit's guidance in *James*, the Court will disregard Plaintiff's unverified Supplemental Declaration.

The record does not show that Defendant Dunn knew of and consciously disregarded Plaintiff's serious medical need in violation of the Eighth Amendment. Plaintiff's medical records show that Dunn provided medical care to Plaintiff on February 9, 11, and 17, 2020. (Pl. Med. Recs., Doc. 85-11 at 43, 46, 48.) During those encounters, Dunn provided Plaintiff with medications to address Plaintiff's heartburn and pain. Dunn also provided Plaintiff guidance on how to manage his pain.

As for the remaining Defendants, they were entitled to defer to the judgment of Plaintiff's treating physician and the nursing staff regarding Plaintiff's care unless doing so was unreasonable. *See Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019) (affirming summary judgment in favor of non-medical defendants where the record showed the plaintiff "was receiving regular medical attention from psychologists, psychiatrists, and mental health professionals" and where plaintiff did "not present[] evidence that his grievances were ignored or mishandled" or "that he was not receiving adequate care").

Therefore, Defendants' Motion for Summary Judgment on Count II of Plaintiff's Second Amended Complaint is granted.

### 2. Conditions of Confinement

In its prohibition of "cruel and unusual punishments," the Eighth Amendment imposes upon prison officials the duty to provide humane conditions of confinement.

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To succeed on a claim of inhumane conditions of confinement, a plaintiff must satisfy a test that contains both an objective and subjective component. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). The objective component focuses "on the nature of the defendants' acts" and whether a plaintiff was forced to endure conditions that "exceeded contemporary bounds of decency of a mature, civilized society." *Id*. "This is necessarily a difficult and imprecise contextual inquiry." *Id*. The subjective component focuses on whether the prison officials acted with a sufficiently culpable state of mind known as deliberate indifference—that is, whether the official knew about the risk of harm, had the ability to prevent the harm, yet failed to do so. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir.2009); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("An official is deliberately indifferent when he is subjectively aware of the condition or danger complained of, but consciously disregards it.").

Plaintiff asserts he was subject to confinement in a cell with no running water or toilet. However, these conditions alone do not rise to a constitutional violation where other accommodations are afforded. *See Tesch v. County of Lake*, 157 F.3d 465, 476 (7th Cir.1998) (denial of drinking water for several days is not a constitutional violation when inmates receive beverages with each of their three daily meals); *Davis v. Biller*, No. 00 C 50261, 2003 WL 22764872, at *2 (N.D. Ill. Nov.19, 2003) (inmate has a fundamental right to drinking water but a dysfunctional sink alone is not necessarily cruel and unusual punishment); *Thomas v. McCoy*, 2020 WL 247464, at *4 (N.D. Ill., 2020) (the plaintiff did not state a claim where he alleged that he was confined for 13 days to a cell with a plugged

toilet because the plaintiff was allowed to use a functioning toilet outside his cell during this period).

Plaintiff does not allege he was denied water, and the record shows that he was provided a glass of water when exiting his cell. Additionally, Plaintiff acknowledged that he had an alternative means to defecate, and a portable urinal was placed in his cell. Furthermore, for the reasons noted earlier, Plaintiff cannot rely solely on allegations in his Second Amended Complaint asserting that Defendants Burzlaff, Hendley, Tapia, Cox, and Jensen refused him access to the restroom to defeat summary judgment.

Therefore, Defendants' Motion for Summary Judgment on Count III of Plaintiff's Second Amended Complaint is granted.

### 3. Civil Conspiracy

"A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means.'" *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). "To prevail on a conspiracy claim, 'the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights.'" *Daugherty v. Harrington*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman*, 776 F.3d at 510).

The mere suggestion of the possibility of the existence of a conspiracy cannot defeat summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013); *see also Lewis v. Mills*, 677 F.3d 324, 332 (7th Cir. 2012) ("Vague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden . . . ."); *Williams v.*

*Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) ("Although a conspiracy certainly may be established by circumstantial evidence, we have stressed that such evidence cannot be speculative.").

Defendants assert they are entitled to judgment as a matter of law regarding Plaintiff's civil conspiracy claims because no evidence exists that Defendants had an agreement to inflict punishment or deprive Plaintiff of his constitutional rights. Plaintiff asserts that "ample circumstantial evidence exists of a civil conspiracy to deprive [Plaintiff] of his constitutional rights …[a]t some point in 2020." (Pl. Res. Doc. 88 at 35.) In support, Plaintiff claims that Defendants conspired to hold him in his cell, changed EMCC's shower policy, denied Plaintiff family visits, and disparaged Plaintiff. However, Plaintiff fails to provide evidence to infer an agreement or understanding. *See Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) ("[I]n order to sustain a claim that the defendants conspired to deny the plaintiff his constitutional rights, 'there must be allegations that the defendants directed themselves toward an unconstitutional action by virtue of a mutual understanding.") Thus, Defendants' Motion for Summary Judgment is granted as to Counts IV and VI of Plaintiff's Second Amended Complaint.

### 4. State Law Claims for IIED

To prevail on a claim of intentional infliction of emotional distress under Illinois law, a plaintiff must show that "(1) the defendants engaged in 'extreme and outrageous' conduct; (2) the defendants 'either intended that [their] conduct would inflict severe emotional distress, or knew there was a high probability that [their] conduct would cause severe emotional distress'; and (3) the defendants' 'conduct in fact caused severe

emotional distress.'" *McGreal v. Village of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017) (quoting *Zoretic v. Darge*, 832 F.3d 639, 645 (7th Cir. 2016)). "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006) (citations omitted)). "An important factor in this analysis is whether a defendant abused a position of authority." *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010).

Defendants contend that they are entitled to judgment as a matter of law because Plaintiff "has not presented sufficient facts from which a jury could infer that [their] conduct was extreme and outrageous." (Doc. 85 at 30.) The Court agrees based on the dismissal of Counts II and III of Plaintiff's Second Amended Complaint. Therefore, Defendants' Motion for Summary Judgment on Count V of Plaintiff's Second Amended Complaint is granted.

Accordingly, the Court grants the Motion for Summary Judgment filed by Defendants Burzlaff, Cox, Dunn, Hamilton, Jensen, McBride, Rodman, Stone, Tapia, Trujillo, Varga, and Wierema.

## IV.   Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment on his conditions of confinement claim against Defendants Burzlaff, Cox, Dunn, Hamilton, Jensen, Rodman, Tapia, Trujillo, Varga, and Wierema. However, because the Court has dismissed Count III of Plaintiff's Second Amended Complaint, Plaintiff's Partial Motion for Partial Summary Judgment (Doc. 82) is moot.

**IT IS THEREFORE ORDERED:**

**Defendants' Motion for Summary Judgment (Doc. 84) is GRANTED, and Plaintiff's Motion for Partial Summary Judgment is DENIED for the reasons stated.**

Entered September 30, 2024.


s/ *Colleen R. Lawless*

_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE